(244 P.3d 698)
No. 103,512

IN THE MATTER OF THE ESTATE OF IRMA M. OSWALD,
Deceased.

Opinion filed December 17, 2010.

*Michael N. Flesher* and *Don C. Staab*, of Hays, for appellant Lloyd E. Oswald.

*Robert E. Diehl*, of Dreiling, Bieker & Hoffman LLP, of Hays, for appellee Henrietta Werth.

Before PIERRON, P.J., GREEN and MARQUARDT, JJ.

GREEN, J.: In an estate proceeding following the death of Irma M. Oswald (Irma Oswald), Lloyd E. Oswald (Lloyd), as trustee of the Irma M. Oswald Revocable Living Trust, appeals the judgment of the trial court ordering immediate distribution of trust assets to the named beneficiaries. Lloyd, one of the beneficiaries of the trust, sought to hold surface title to certain real property in escrow rather than immediately distributing title to the various beneficiaries. Lloyd maintained that the delay in conveying formal title would carry out a material provision of the trust—allowing him to farm the land as long as he wished.

The trial court interpreted the trust document as requiring immediate distribution of the trust assets upon the settlor's death; the court entered a judgment both ordering immediate distribution of the title to the real property and holding that the trust language giving Lloyd the right to continue to farm the land was an enforceable obligation on the beneficiaries. We agree. Accordingly, we affirm.

On June 12, 1997, Irma Oswald executed her last will and testament. She identified her children as follows: Irma Jule Stahl (Irma Stahl), Henrietta Rohleder Werth (Werth), Carrie Dolven (Carrie), Charlotte Dockendorf, and Lloyd. On the same date, Irma Oswald executed the Irma M. Oswald Revocable Living Trust (Trust).

In her will, Irma Oswald named two of her children, Lloyd and Carrie, as coexecutors. Carrie, however, resigned as coexecutor upon the opening of the probate estate. Irma Oswald also devised her entire estate to the Living Trust to be "held or disposed of in accordance with its provisions as the TRUST exists at the time of my death." The will further provided that when making distribution of the estate, the Trust beneficiaries "would be entitled to immediate receipt of their interests *by reason of having met age or other contingencies stated as conditions precedent* to their taking, my Executor may make distribution directly to such beneficiaries from the estate, rather than turning such interest over to the Trustees for immediate distribution." (Emphasis added.) Fi-

nally, the will included an *in terrorem* clause forfeiting any beneficiaries' share if the beneficiary "attacks this Will and the TRUST or any provisions thereof."

As originally drafted, the revocable Trust held unspecified property with Irma Oswald as the grantor, trustee, and primary beneficiary. The Trust instrument referred to property listed on Schedule A as funding the Trust. Nevertheless, there is no Schedule A included in the record on appeal or with the copy of the Trust documents contained in the Appendix of appellant's brief. Nevertheless, Irma Oswald's will had a pour over provision pouring any of her individually owned assets into the Trust upon her death. It permitted the trustee to distribute both the net income and principal of the Trust to Irma Oswald at the trustee's discretion. If Irma Oswald became incapacitated, the successor trustee had sole discretion to apply all or any part of the income or principal toward Irma Oswald's health, education, and support and to execute any documents needed to protect as many of the assets of the Trust from the spend-down requirements for her eligibility for Medicaid.

The key provisions at issue in this case are set forth in Articles IV and V of the Trust. Article IV states:

"Administration on Settlor's Death. On Settlor's death, this Trust shall continue *for the period required to administer Settlor's estate and the assets of this Trust.* Trustee may accumulate income during this period. *After this period of administration is completed,* any gifts or trusts designated below *shall then be funded."* (Emphasis added.)

Article V allocates the Trust assets. The first paragraph, as amended, made no provision for Irma Stahl. The second paragraph, as amended, granted all of Irma Oswald's real property in Fairport, Kansas, equally to the three children of Carrie. Paragraph three addressed the distribution of Irma Oswald's jewelry. Paragraph four granted Lloyd title to Irma Oswald's home in Russell County, Kansas, and all household goods contained in the home. No issue arises as to those provisions.

The disputed portions of Article V provides, in relevant part:

"On Settlor's death, Settlor hereby orders the property to be distributed, as follows:

. . . .

"Fifth: The trust hereby offers the right to farm all real estate for so long as he desires and the first option to purchase real estate, unto my son, Lloyd E. Oswald. Lloyd E. Oswald shall tender proper landlord shares to the owners of said real estate.

"Sixth: All the rest, residue and remainder of my trust, be it real, personal or mixed, of whatsoever kind and nature and wheresoever situated shall be distributed to my daughters, ¼th to Carrie Dolven and ¼th to Henrietta Rohleder and ¼th to my son Lloyd E. Oswald. A ⅛th to pass onto Jessica Dockendorf *to be held in trust by the Trustees of this trust until Jessica Dockendorf reaches the age of 25*and [*sic*] and ⅛th shall pass and be to my daughter, Charlotte Dockendorf. (Emphasis added.)

The one obvious ambiguity in the Trust was created by the 2006 amendment. It states that "[a]s to ARTICLE V, Property, *Second Paragraph*, that upon Settlor's death, Carrie is to be removed *completely* as a beneficiary of my Trust. [Her] share shall pass equally to her children . . . ." (Emphasis added.) Carrie was named as a beneficiary in two places in ARTICLE V, Paragraph Second *and* Paragraph Sixth. The trustee apparently interpreted this amendment to alter both paragraphs, with ⅟₁₂th of the residue property (Paragraph Sixth) going to each of Carrie's children: Mable Walker, Sean Dolven, and Ian Dolven. This interpretation apparently was not contested by any of the parties, was not addressed specifically in the trial court's distribution order, and is not at issue in this appeal.

Irma Oswald died in March 2008. She was survived by all five of her children. Lloyd filed a petition for probate of Irma Oswald's will in September 2008. In March, 2009, the will was admitted to probate, and Lloyd was issued letters testamentary. Within a week of receiving his letters testamentary, Lloyd filed a petition with the Trust documents attached requesting court permission to approve an escrow agreement and new 1-year farm lease agreement. Under the escrow agreement, Lloyd would execute deeds for the surface rights to the 1,340 acres of farm real property—made out in the names of the various residuary beneficiaries—with the deeds to be delivered when he retired or ceased farming. Upon the occurrence of either event, the "deeds would become effective and delivered." In addition, Lloyd asked that the Trust be allowed to maintain $15,000 in escrow as operating expenses for the farming operation.

Lloyd asserted that these actions were necessary to carry out the terms of the Trust and protect his "absolute right" to farm the property as long as he wished. Lloyd attached copies of the proposed trustee's deeds to the various beneficiaries and a 1-year crop sharing landlord and tenant agreement, dated March 1, 2009, signed by himself as trustee and as tenant.

Werth, one of the named beneficiaries, responded to Lloyd's petition. She challenged Lloyd's interpretation of the Trust. Werth asserted that the Trust was unambiguous and required immediate distribution of the Trust assets to all beneficiaries, including full title to the real property. Werth also requested that if the title was to be held in escrow, the trial court should determine whether the proposed lease agreement was reasonable. Werth also challenged Lloyd's request that he be allowed to maintain $15,000 in escrow for farming operating expenses. Finally, Werth contended that Lloyd had failed to comply with the Trust, which required the trustee to render an annual accounting of the Trust and to make trust records available to beneficiaries for inspection.

Following a case management conference, Lloyd was ordered to provide an inventory and accounting of the Trust. The inventory shows the probate assets, including real estate, cash, and other property totaling more than $1.5 million. It is not clear if these assets were preexisting assets of the Trust or became part of the Trust on Irma Oswald's death. After a second case management conference, the parties were ordered to brief the question of whether the surface rights to all the farm real property should be immediately transferred or held in escrow.

Both Lloyd and Werth, in their trial briefs, argued that the Trust language was clear and unambiguous. Both parties cited to various cases discussing the interpretation of trusts as well as to the Kansas Uniform Trust Code (KUTC), K.S.A. 58a-101 *et seq*. None of the other beneficiaries filed a response.

Lloyd argued that permitting him to farm the land was, upon Irma Oswald's death, "a primary purpose" of the Trust. Lloyd contends that this would be beneficial to "all concerned" because the Trust would be responsible for overseeing the farming operation, paying for insurance and taxes, and enrolling the farmland in gov-

ernment programs. Lloyd contends that his proposal implements Irma Oswald's intent and would safeguard against having to appoint a financial institution as successor trustee. In addition, Lloyd cites to the various powers given to him as trustee, including "operating farming enterprises." In his reply brief, Lloyd argued that he would have no enforceable right to continue to farm the real property if the Trust was terminated.

Werth maintained in her trial brief that the unambiguous language of the Trust required immediate distribution of all property on Irma Oswald's death and contained no language allowing Lloyd to hold title to the farmland in escrow. Werth further asserted that all of the other property in the Trust had been distributed by the trustee according to the Trust's terms, except for the surface rights of the farmland. Werth noted that the powers given to the trustee did not include delaying distributions following Irma Oswald's death. Werth further contended that no farm landlord advances cash to his tenant for operating expenses.

In October 2009, the trial court issued its decision. The trial court examined the four corners of the Trust document and concluded that the Trust was unambiguous and it was clear that Irma Oswald intended that all property be distributed immediately or within a reasonable timeframe for closing her estate. The trial court concluded that the Trust language was sufficient to protect Lloyd's right to farm the land and his right to a first option to purchase the real property. In conclusion, the trial court ordered Lloyd to transfer the residue of the Trust to those entitled under the terms of the Trust. It denied Lloyd's request to hold title in escrow and to withhold $15,000 in Trust funds for farming expenses. The trial court further held that Lloyd was entitled to farm the land on a landlord and tenant sharing arrangement as regularly practiced.

*Did the Trial Court Err in Finding the Trust Language Did Not Permit the Trustee to Retain Surface Title to the Farmland in Escrow?*

On appeal, Lloyd contends that the trial court erred in interpreting the Trust as terminating on Irma Oswald's death. Lloyd

asserts that there was still a "material purpose" for the Trust—allowing him to farm the real property as long as he wished.

Both the interpretation of a trust and the question of whether its terms are ambiguous are issues of law subject to unlimited review. *In re Testamentary Trust of Keys*, 40 Kan. App. 2d 503, 508, 193 P.3d 490 (2008).

Both parties maintained that the Trust was unambiguous, and they only disputed the legal effect of the terms used. The primary function of a court in interpreting a trust is to ascertain the settlor's or testator's intent as derived from the four corners of the document, and, once ascertained, the intent will be executed unless contrary to law or public policy. *Keys*, 40 Kan. App. 2d at 508. If the settlor's or testator's intent can be clearly divined from the words used, there is no reason to employ the rules of construction; instead, the trust is simply enforced according with its express terms and provisions. *Keys*, 40 Kan. App. 2d at 508 (citing *In re Estate of Berryman*, 226 Kan. 116, 119, 595 P.2d 1120 [1979]). A written instrument is ambiguous only when its meaning is doubtful. See *Weber v. Tillman*, 259 Kan. 457, 476, 913 P.2d 84 (1996).

In reading within the four corners of the Trust, it is clear that Irma Oswald intended the Trust to terminate and the Trust res to be distributed upon her death. Article III established the primary purpose of the Trust was to provide for Irma Oswald's needs during her lifetime. Article IV provides for administration of the Trust upon Irma Oswald's death and explicitly provides that after the period of administration is completed, "any gifts or trust designated below *shall then be funded.*" Article V provides that on Irma Oswald's death, she "orders the property to be distributed." While the fifth paragraph offers Lloyd the right to farm all real property for as long as he desires, he is required to pay proper landlord shares "to the owners of said real estate."

In the phrase "to the owners of said real estate," the phrase clearly refers to the beneficiaries' ownership rights in the farmland. According to Black's Law Dictionary 1105 (6th ed. 1990), the word "owner," when referring to land, is defined as "one who owns the fee and who has the right to dispose of the property." Indeed, the right to sell, mortgage, convey, or otherwise alienate a person's real

property is considered the most important incident of fee-simple title.

As a result, Lloyd's position requires a distorted reading of the express language under Article V, Paragraph Fifth: "Lloyd . . . shall tender proper landlord shares *to the owners of said real estate.*" (Emphasis added). Lloyd's position is contrary to the plain language of the Trust because under his interpretation of the Trust, the beneficiaries would not enjoy the right of disposal until Lloyd ceased farming the farmland.

Further, the Trust gave Lloyd the immediate right of first refusal: "the first option to purchase all real estate." Admittedly, the various beneficiaries under Article V would need title to the real property and a desire to sell before Lloyd's enforceable right to purchase the real property would be triggered. See *Bergman v. Commerce Trust Co.*, 35 Kan. App. 2d 301, 306, 129 P.3d 624 (2006) (A right of first refusal requires the owner, when and if the owner decides to sell, to offer the property first to the person entitled to the preemptive right at the stipulated price.). This is another clear indication that Irma Oswald intended the beneficiaries under Article V to receive immediate title to their share of the real property.

Indeed, there is no express or implied provision in the Trust that provides for the continuation of the Trust to permit Lloyd to continue his farming operations. In fact, the Trust lacked any language that the Trust was to continue for a stated time. Under such circumstances, a trust is generally held to last until the settlor's purpose has been accomplished. If the purpose has been accomplished, a further continuation of the trust is useless, and the trust should be terminated. See *Clement v. Charlotte Hospital Ass'n, Inc.*, 137 So. 2d 615, 617 (Fla. Dist. App. 1962) ("A trust estate is vested in the trustee, but its duration and extent are governed by the requirements of the trust. When no intention to the contrary appears, the trust estate will not be continued beyond the purposes of its creation as set forth in the trust instrument. When these purposes are accomplished, the trust estate ceases to exist and the trustee's title becomes extinct."); see also 76 Am. Jur. 2d, Trusts §

85 ("The termination of a trust is authorized if its purpose has been fulfilled.").

Here, the Trust simply imposed an obligation on the beneficiaries: to allow Lloyd the right to farm the land "so long as he desires" and the right of first refusal if any beneficiary should desire to sell his or her real property. It is apparent that this obligation on the beneficiaries would have accomplished Irma Oswald's purpose: the beneficiaries receiving title to the real property and Lloyd receiving the right to farm the real property as long as he wished.

Lloyd, however, contends that protecting his right to farm the land was a "material purpose" of the Trust and, therefore, the Trust could not be terminated. Lloyd asserted that continuing the Trust and holding the surface rights to the real property would be beneficial to "all concerned" because the Trust would be responsible for overseeing the farming operation, paying for insurance and taxes, and enrolling the farmland in government programs. Nevertheless, convenience to the beneficiaries, Lloyd in particular, was not a material purpose of the Trust as set forth under the plain language of the Trust. Clearly, the Trust could have been written to give Lloyd a life estate in the property as long as he farmed the real property, but it did not. It called for distribution of the property subject to Lloyd's rights, with Lloyd's payment of landlord shares to the owners.

" 'Material purposes [in trusts] are not readily to be inferred. A finding of such a purpose generally requires some showing of a particular concern or objective on the part of the settlor, such as concern with regard to a beneficiary's management skills, judgment, or level of maturity. Thus, a court may look for some circumstantial or other evidence indicating that the trust arrangement represented to the settlor more than a method of allocating the benefits of property among multiple intended beneficiaries, or a means of offering to the beneficiaries (but not imposing on them) a particular advantage.' Restatement of the Law Third, Trusts § 65, comment d, p. 477 (2001)." *In re Trust of Darby*, 290 Kan. 785, 792, 234 P.3d 793 (2010).

Lloyd contends on appeal that once there is a distribution of surface rights to the beneficiaries, the Trust is terminated and the beneficiaries would have no obligation to honor Lloyd's right to farm the land or to honor his option for first purchase. This con-

tention fails for several reasons. First, Lloyd cites no legal authority to support his contention that the beneficiaries would not be bound by the Trust's provision allowing him to farm the land. Failure to support a point with pertinent legal authority or show why it is sound is akin to failing to brief the issue. *State v. Conley*, 287 Kan. 696, 703, 197 P.3d 837 (2008). Second, the trial court's journal entry specifically ordered that the real property be distributed subject to Lloyd's right to farm. No party cross-appealed that ruling. Finally, the *in terrorem* clause of Irma Oswald's will prohibits challenges to the will *or* the terms of the Trust. Any beneficiary making such a challenge could be divested of his or her share of the Trust.

Although a trust may terminate in more than one way, the KUTC recognizes that a trust "terminates to the extent the trust . . . expires pursuant to its terms." K.S.A. 58a-410(a). "[O]n termination of the trust," a trustee's duty under the KUTC is to "exercise the powers appropriate to wind up the administration of the trust and distribute the property to the persons entitled to it." K.S.A. 58a-816(26). This suggests that the "persons entitled to" the trust property may be determined at termination of the trust. *Keys*, 40 Kan. App. 2d at 510.

Werth cites *In re Hilgers*, 371 B.R. 465 (Bankr. 10th Cir. 2007), in support of her position. In that case, trustees attempted to continue the trust to protect the remainder beneficiary's distribution from becoming an asset of his bankruptcy estate. Both the bankruptcy court and the appeals panel interpreted the trusts as only continuing during the lifetime of the life beneficiaries and that, upon the death of the life beneficiaries, all of the remaining property was to be distributed to the Hilgers' children or grandchildren. 371 B.R. at 469-70. The court refused to delay distributions because the possibility of tax issues or to impose a spendthrift provision to benefit the beneficiary when no such clause was contained in the trust. 371 B.R. at 471.

Under the terms of the Trust, the only ground for maintaining the Trust after the administration of Irma Oswald's estate was if one of the named beneficiaries was under the age of 25. We assume that Jessica Dockendorf had achieved the age of 25 because Lloyd issued a title for her share of the property as part of his proposed

escrow agreement and has not used her age as a justification to extend the Trust. In any event, the Trust contained a separate provision for setting aside an underage or incompetent beneficiary's share in a separate trust.

Our Supreme Court has defined a trust as follows: "[W]e adopt for our purposes the definition of a trust as being a fiduciary relationship with respect to property subjecting the person by whom the property is held to equitable duties to deal with the property for the benefit of another person, and arising as the result of an intention to create the relationship." *In re Estate of Sheets*, 175 Kan. 741, 746, 267 P.2d 962 (1954). Here, under this definition, the beneficiaries would have been the obligees of the equitable obligations which Lloyd (as trustee) assumed.

Moreover, it is apparent that Irma Oswald intended that once Lloyd (as trustee) furnished the beneficiaries with title to the real property, the beneficiaries would become the obligors of the remaining equitable obligations which Lloyd (as trustee) had assumed: Lloyd's "right to farm all real estate for so long as he desires and the first option to purchase all real estate." Indeed, the trial court recognized the beneficiaries' obligation to Lloyd when it determined that the beneficiaries would take title to their respective real property interests subject to Lloyd's right to continue to farm the land.

Finally, the legislature furnishes Lloyd with a way to protect his right to continue to farm the land under K.S.A. 58-2221. See *Misco Industries, Inc. v. Board of Sedgwick County Comm'rs*, 235 Kan. 958, 961, 685 P.2d 866 (1984) ("The purpose of [K.S.A. 58-2221] is to provide a system of registration for instruments affecting the title to land. The record is kept to insure the title and its history may be preserved and protected. The statute makes readily available to the public notice of title to property or liens and adverse claims against property.").

Based upon the plain language of the Trust, the trial court correctly concluded that the Trust was unambiguous and that its assets were to be fully disbursed to the named beneficiaries upon Irma Oswald's death. Accordingly, the trial court's rejection of Lloyd's escrow plan, as well as its order requiring the beneficiaries to take

the real property subject to Lloyd's right to farm the land, was proper.

*Whether the Trust Was Ambiguous and Permits the Use of Parol Evidence to Interpret the Trust?*

For the first time on appeal, Lloyd also contends that the Trust agreement is ambiguous because it does not provide directions how the Trust is to be administered during the period of time Lloyd is exercising his right to farm the land. Accordingly, Lloyd now maintains that the Trust is ambiguous and that parol evidence should be considered in ascertaining the meaning of the words used in the Trust. Lloyd contends that his proposal for holding title in escrow and the terms of the lease he signed as both trustee and lessor is based upon his "experience as tenant with the Settlor and customary practices in farm lease arrangements." Lloyd maintains that the trial court did not allow testimony regarding Irma Oswald's intent and makes a proffer in his brief of his knowledge of Irma Oswald's intent.

Nevertheless, Lloyd did not contend that the Trust was ambiguous in his arguments to the trial court, nor did Lloyd request an evidentiary hearing to present parol evidence to the trial court. Had he done so, Werth would have had a similar opportunity to present parol evidence.

Generally, issues not raised before the trial court cannot be raised on appeal. *Miller v. Bartle*, 283 Kan. 108, 119, 150 P.3d 1282 (2007). Moreover, Lloyd does not argue that this issue falls within one of the recognized exceptions to this rule. Further, the present issue does not fall within one of these exceptions. See *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284, *cert. denied* 129 S. Ct. 1320 (2008) (exceptions if issue presents only a question of law arising on proved or admitted facts; review is necessary to serve the ends of justice; and court's judgment is correct but based on the wrong reason).

Finally, a contention of ambiguity, to be cognizable, must be based on more than possible contestability in the instrument. Moreover, an agreement is not made ambiguous "merely because the parties disagree as to its meaning when the disagreement is not

based on reasonable uncertainty of the meaning of the language used." *Tri-Cor, Inc. v. United States*, 458 F.2d 112, 126 (Cl. Ct. 1972). Accordingly, an allegation of ambiguity does not substitute for a true lack of clarity. "Words do not become ambiguous simply because lawyers or laymen contend for different meanings or even though their construction becomes the subject matter of litigation." *Thomas v. Continental Casualty Company*, 225 F.2d 798, 801 (10th Cir. 1955).

As noted earlier, the Trust is clear and unambiguous as to its termination, and the trial court's judgment protects Lloyd's right to farm the land for as long as he desires.

Affirmed.